IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD J. WITKOWSKI,              :
                Plaintiff          :
                                   :
      vs.                          :   CIVIL NO. 1:CV-13-0161
                                   :
CAROLYN W. COLVIN, Acting          :     (Judge Caldwell)
Commissioner of Social Security    :
                Defendant          :
                                   :

*M E M O R A N D U M*

I.   *Introduction*

Pursuant to 42 U.S.C. § 405(g), plaintiff, Richard J. Witkowski, seeks review of a decision denying him disability insurance benefits under the Social Security Act.  See 42 U.S.C. §§ 401-433.  The defendant is Carolyn W. Colvin, the Acting Commissioner of Social Security.[1]

Plaintiff alleges he became disabled when he suffered a back injury on September 23, 2007, after being rear-ended in an automobile accident.  He underwent a series of treatments culminating in an operation on January 29, 2009, that fused the L5-S1 vertebrae.  He filed his application for benefits on October 21, 2008, alleging an onset date for disability of September 23, 2007, the date of the accident.  (Tr. 107-108).[2]  On

─────────────────────

[1]  The case had been brought against Michael Astrue, the former Commissioner. Pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), Colvin is substituted as the defendant.

[2]  References to "Tr. ___" are to pages of the administrative record (Doc. 26) Defendant filed on April 11, 2013.

May 6, 2010, a hearing was held (Tr. 46), and on June 24, 2010, the administrative law judge (ALJ) denied benefits.  (Tr. 23).  On July 8, 2011, the Appeals Council denied a request for review.  (Tr. 1).

Plaintiff claims that the ALJ did not properly analyze his complaints of pain in not fully crediting those complaints.  As we read Plaintiff's brief, he argues that the ALJ made the following errors in regard to his complaints of pain.  First, the ALJ relied on her own lay opinion in rejecting Plaintiff's subjective complaints of pain.  Second, she failed to explain why the medical evidence she did cite supported her conclusion about Plaintiff's complaints of pain.  Third, the ALJ did not consider all the evidence as her decision shows that she engaged in only a truncated analysis of the medical record.  Fourth, the ALJ failed to consider Plaintiff's persistent efforts to obtain pain relief.  Fifth, the ALJ failed to consider Plaintiff's long work history.  Sixth, the ALJ failed to consider the side effects of the pain medication Plaintiff is taking on his ability to work.

II.  *Background*

A.  *Work*

Plaintiff was forty-one years old at his alleged onset date.  (Tr. 54).  He has eleven years of education.  (Tr. 78).  In the fifteen years before the accident, he worked as a parts-room attendant, CD manufacturer, and CD supervisor, all with Cinram Corp., a manufacturer of CDs and DVDs.  Plaintiff worked at Cinram from 1991 through September 2007.  After the accident, he attempted to work as a van driver from

-2-

November 2007 through June 2008.  Plaintiff had a twenty-four-year work record from 1984 through 2008.  (Tr. 71-72, 110, 139).

B. *Function Reports*

In an undated Function Report written before his hearing, Plaintiff complained of constant low back pain with pain shooting down both legs, mostly on the left side.  (Tr. 119).  He also reported that his medications cause drowsiness and dizziness (Tr. 119).  In a Function Report dated December 9, 2008, about seven weeks before the fusion surgery, he described the following daily activities.  He got up, showered and shaved, dressed, and had breakfast.  (Tr. 147).  He would sit or lay on the couch watching television, but would go to doctor's appointments, if he had any, and pick his son up from school three days a week.  (Tr. 147).  He would then watch television, either sitting on the couch or laying in bed.  (Tr. 147).  He also used his TENS unit for an hour each day.  (Tr. 147).

In the same Function Report, he wrote that he would wake up several times a night because his legs and back were in pain.  (Tr. 148).  He could cut the grass with a riding lawn mower, but it would sometimes take him up to two days to finish.  (Tr. 149).  He could stop and pick up something from the store once or twice a week if his wife needed it.  (Tr. 150).  His wife took care of their children, getting them ready for school, assisting with homework, and making their meals.  (Tr. 148).  His wife did the housework and other yard work because plaintiff would suffer back pain if he attempted it.  (Tr. 150).  He spends most of his time at home, not caring to go out because he is always in

discomfort (Tr. 152).  He cannot lift more than ten to twenty pounds.  (Tr. 152).  Pain

distracts him from completing tasks.  (Tr. 152).

> C.  *Plaintiff's Testimony at the Administrative Hearing*

At the May 2010 hearing on his disability application, Plaintiff testified that

he has gained weight since the accident; he now weighs 240 pounds.  (Tr. 54).[3]  He was

able to drive himself to the hearing and generally drives a couple of times a week, to

doctor appointments or to run errands.  (Tr. 55-56).  He had to stop his work as a van

driver, which he did a few hours per week from November 2007 through June 2008,

because the pain was getting to be too much.[4]  (Tr. 57-58).

Plaintiff also testified to the kinds of activities he could do on a typical day.

He cannot play outside with his children.  (Tr. 60).  He might visit someone for awhile and

then come home and lie around.  (Tr. 60).  His sleep continues to be disturbed by pain,

more so after his operation.  (Tr. 60).  He gets up four to five times a night.  (Tr. 60).  He

tries not to nap during the day because he might not sleep at night, but because he is

sitting or laying around a lot, he will doze off.  (Tr. 61).  He is no longer able to assist his

wife with the cooking and cleaning.  (Tr. 61).

Plaintiff can sit for up to fifteen minutes before needing to change positions.

(Tr. 62).  His back will hurt if he tries to take a bag out of the car for his wife.  (Tr. 62).

---

[3]  His counsel said that the gain has been about thirty-five or forty pounds.  (Tr. 53).

[4]  This job required Plaintiff to drive a boy back and forth to school.  In addition to the pain, the boy was "a little hyper" and "was getting [to be] too much."  (Tr. 57-58).

His wife does most of the errands, and he now rarely goes with her to help.  (Tr. 62-63).

He gave up his hobbies of four-wheeling, riding a motorcycle, and playing ball with his

kids.  (Tr. 63).  He thinks he could lift a gallon of milk.  (Tr. 63).

Since his back surgery, plaintiff has numbness down his left leg, and the

tops of his feet "like the toes, they feel like they're going to explode all the time."  (Tr. 63).

His legs are weak all the time, and his ankles are giving up on him.   (Tr. 64).  His

symptoms are different from how he felt before the surgery.  Although he had left leg pain

before the surgery, he now has "a constant pain going down the leg . . . all the way

down."  (Tr. 64).  Plaintiff would rather have the pain that he had before the surgery

compared to his current symptoms; the toes feel like they "are going to just blow right

off."  (Tr. 64).

Plaintiff's medications include Gabapentin, Magnacet, Amrix and

Amitriptyline.  The side effects from his current medications include loss of focus and

problems concentrating. (Tr. 67).  They may also include dizziness.  (Tr. 65).  Plaintiff

rated his pain at an eight on a zero-to-ten pain scale, even when on his medications.  (Tr.

68-69).  He takes his medications but gets little relief from his pain.  (Tr. 69).  He is

looking for another doctor since his current one cannot assist him further.  (Tr. 68).

D.  *Medical History*

As noted, Plaintiff's health problems began with the automobile accident of

September 23, 2007.  At the emergency room, he was diagnosed with a lumbar strain

and a cervical strain.  (Tr. 169).  On September 25, 2007, he returned to the emergency

room and an X-ray was taken.  The impression was: "Advanced disc space narrowing at L5-S1.  No fractures are seen in the lumbar spine.  Small osteophyte is seen at the inferior end-plate of L5 anteriorly."  (Tr. 184).

On September 28, 2007, Plaintiff had an initial consultation with Vincent Argenio, a chiropractic physician.  Plaintiff complained of sharp lumbar pain, radiating into both legs.  (Tr. 185).  Dr. Argenio diagnosed a lumbar sprain and sciatica.  (Tr. 186).  He prescribed therapy three times a week for six weeks.  (Tr. 187).  Plaintiff underwent therapy with Dr. Argenio from October 1, 2007, through December 12, 2007.  He reported at times varying degrees of improvement in his pain but nothing significant.  (Tr. 185-196).

On October 2, 2007, Plaintiff began treating with Albert Janerich, M.D.  At that time, he complained of low back pain which was a dull, throbbing pain bilaterally with a burning and tingling pain in his legs.  (Tr. 214).  Plaintiff had lumbar paraspinal spasm, left greater than right.  (Tr, 214).  Plaintiff was able to flex to 50 degrees with incomplete flattening of the lordotic curve.  (Tr. 214).

Dr. Janerich ordered an EMG test and an MRI of the lower back.  (Tr. 214). The October 8, 2007, EMG was positive for a left L4-5 radiculopathy.  (Tr. 215, 223).  The October 3, 2007, MRI showed disc degeneration with mild to moderate disc protrusion and marginal osteophytosis impinging upon the dural sac and narrowing both neural foramina, left greater than right, at L5-S1.  (Tr. 216, 224).

At the next visit on December 12, 2007, Dr. Janerich observed that Plaintiff had lumbar paraspinal spasm, left greater than right, that Plaintiff was able to flex to 50 degrees with incomplete flattening of the lordotic curve.  (Tr. 216).  Dr. Janerich recommended that Plaintiff receive epidural injections  and that he try physical therapy.

On January 21, 2008, Plaintiff was seen at Anesthesia Associates for the epidural injections.  Plaintiff had low back pain, "radiating into both lower extremities, but worse on the left side."  (Tr. 205).  He described his pain as a "shooting, throbbing, nauseating, pressure-like constant type" and rated it at a 7 on a zero-to-ten pain scale.  (Tr. 205).  The pain was worse whenever he was sitting, standing, and walking.  (Tr. 205).  In a Pain Questionnaire, Plaintiff stated that his medications "take the edge off," that physical therapy "causes more pain," and that electro-therapy and massage therapy "helped ease some of the pain."  (Tr. 210).  On examination, plaintiff had positive straight-leg raising on the left side and negative on the right side.  (Tr. 205).  There was moderate tenderness at the paralumbar spinal area at the level of L4/L5 and L5/S1, but mostly at L5/S1.  (Tr. 205).  He had diminished pin prick and light touch sensation at the L5 dermatome.  Dr. Dong-Joon Oh diagnosed plaintiff with a lumbar radiculopathy at L5/S1 and performed an epidural injection (Tr. 205-206).

On March 11, 2008, Plaintiff returned, again for treatment of low back pain radiating into his legs.  (Tr. 204).  He reported "good pain relief" from the first injection although "significant pain remains."  (Tr. 204).  On examination, plaintiff had positive straight-leg raising on the left side and negative on the right side.  (Tr. 204).  There was

severe tenderness at the left paralumbar spinal area at the levels of L4/L5 and L5/S1.

(Tr. 204).  Dr. Oh gave him another epidural injection.  (Tr. 204).

On April 23, 2008, Plaintiff received another injection.  (Tr. 203).  At that

time, he described the pain as seven to ten on a zero-to-ten pain scale.  (Tr. 202).  He

could not walk more than fifteen to twenty minutes.  On examination, Dr. Dasa Satyam

observed "diffuse and severe tenderness in the lumbrosacral region, more pronounced

on the left side than the right," straight leg raising was positive bilateral but worse on the

left, the knee and ankle deep tendon reflexes were intact, and there was no major

sensory deficit to light pinprick in any of the dermatomes.  (Tr. 202).

On June 3, 2008, Plaintiff received another injection from Dr. Satyam.  At

that time, Plaintiff reported that the last injection had given him "excellent pain relief" but

that the pain had returned and was "pretty close to what it was before."  (Tr. 200).  On

examination, there was "diffuse tenderness in the lumbrosacral region, more pronounced

on the left side than the right," "extension and flexion of the spine does not increase the

pain," "mild to moderate tenderness over the lower two facets on the left side," straight

leg raising was positive on the left, the knee and ankle deep tendon reflexes were

normal, and there was no sensory deficit.  (Tr. 200).

Plaintiff's next visit with Dr. Janerich was April 28, 2008.  Dr. Janerich noted

that Plaintiff was doing physical therapy but that the therapy was of "questionable help."

(Tr. 217).  On examination, there was lumbar paraspinal spasm and Plaintiff was able to

flex to 60 degrees with incomplete flattening of the lordotic curve.  Dr. Janerich recommended a TENS unit.  (Tr. 217).

In May 2008, Dr. Janerich noted that Plaintiff's lower back pain was now chronic.  (Tr. 218).  There was "some improvement" with physical therapy.  (Tr. 218).  On examination, there was "an illiolumbar trigger point and more focal tenderness over the S1 joint."  In September 2008, Dr. Janerich noted no "lasting improvement" after completing a course of physical therapy, and no improvement after the epidural injections.  (Tr. 219).  Plaintiff was twenty to thirty per cent of normal on the lower back pain and radicular features.  (Tr. 219).  On examination, Plaintiff's movements were guarded, there was spasm, and thoracolumbar mobility was reduced but no trigger points were identified.  Dr. Janerich recommended that Plaintiff continue with his home exercises and use of the TENS unit.  (Tr. 219).

In October 2008, referred by his attorney, Plaintiff consulted with Dr. Alan Gillick, an orthopedic surgeon.  (Tr. 226).  Plaintiff reported "constant low back pain, aching in his legs, the left a little worse than the right."  (Tr. 226).  Dr. Gillick noted the prior treatments -- massage, physical therapy, TENS unit, acupuncture and epidurals. (Tr. 226).  An X-ray showed "end stage narrowing of the L5-S1 disc space."  (Tr. 226).  A CT scan showed degenerative changes at L5-S1 with diffuse posterior vertebral body spondylosis and disc bulging.  (Tr. 227).  On examination, Plaintiff had "tenderness localized to the L5-S1 junction."  (Tr. 226).  "He has a lot of increased pain with extension," negative straight leg raising on the right and the left causes back pain only,

normal sensation, normal motor strength in his legs, and patella and Achilles reflexes were +1 and symmetric.  (Tr. 226).  They discussed the surgical option of a posterior instrumented fusion.

On January 20, 2009, Vinayhart Shah, M.D., a state agency physician, filled out a Physical Residual Functional Capacity Assessment.  This form indicated Plaintiff could do light work.  (Tr. 228-233).

On January 29, 2009, Plaintiff had the surgery, a "bilateral L4-5 laminotomy/decompression of the L5 root," with "instrumented fusion of L5-S1 utilizing BMP and right posterior iliac crest graft."  (Tr. 246).  In the discharge summary, Dr. Gillick noted Plaintiff had "undergone a gamut of conservative treatment including massage, physical therapy, acupuncture and epidurals which did not provide any benefit."  (Tr. 246).

In March 2009, Dr. Gillick observed that Plaintiff was "doing quite well" and that Plaintiff stated "the pain was quite minimal."  (Tr. 254).  At times, he will get sciatic discomfort in the left leg.  (Tr. 254).  On examination, there was "no tenderness, swelling or erythema;" "no pain with gentle flexion and extension;" straight leg raising was negative; normal motor strength and normal sensation in the lower extremities.  (Tr. 254).  Reflexes were +1 and symmetric.  (Tr. 254).  X-rays showed "intact instrumentation, good alignment."  (Tr. 254).

In April 2009, Dr. Gillick observed that Plaintiff was "doing fairly well.  Some days he will get pain but for the most part, he is doing okay."  (Tr. 255).  On examination,

there was "no tenderness," "no pain with movement within the restrictions of the brace" Plaintiff was wearing, "straight leg raising was negative," normal motor strength and normal sensation in the lower extremities.  (Tr. 255).  Reflexes were +1 and symmetric. (Tr. 255).

On May 21, 2009, David Bosacco, M.D., performed an independent medical evaluation for Plaintiff's insurance company.  On examination, Plaintiff had normal appearance, posture, gait, and heel and toe standing.  (Tr. 251).  "Motor power in the lower extremities was normal."  (Tr. 251).  He had a positive straight leg test on the left side, and "lumbar tenderness and spasm."  (Tr. 251).  The "left Achilles reflex was depressed."  (Tr. 251).  "Voluntary range of motion of the lumbar spine showed thirty degrees flexion, 10 degrees extension, 20 degrees lateral bending right and left, and 45 degrees rotation right and left."  (Tr. 251).  "There was diminished sensation on the left leg and increased sensation on the dorsum of the left foot."  (Tr. 251).  Dr. Bosacco diagnosed "aggravation of lumbar disc disease manifest by a disc protrusion at L5-S1 with lumbar radiculopathy status post fusion surgery."[5]

In June 2009, Plaintiff saw Dr. Gillick again.  Dr. Gillick noted that Plaintiff was "doing relatively well from a back pain standpoint."  (Tr. 256).  His main complaint was numbness in his left leg.  (Tr. 256).  On examination, there was "no tenderness," "no pain with flexion and extension," straight leg raising was negative, motor was normal,

_____

[5]  Dr. Bosacco also noted that a utilization review had concluded "that the treatment provided was reasonable and necessary including the surgery."  (Tr. 251)

-11-

sensation was decreased somewhat in the left thigh.  (Tr. 256).  Reflexes were +2 and symmetric.  (Tr. 256).  X-rays showed "intact instrumentation, good alignment, good healing."  (Tr. 256).

In August 2009, there was another visit with Dr. Gillick.  Dr. Gillick noted that "symtomatically" Plaintiff was "unchanged."  (Tr. 257).  He had "little to almost no back pain," but his left leg symptoms were "similar to what they were preoperatively" with symptoms down the front of his thigh and into his calf.  (Tr. 257).  The worst was the big toe.  It felt as if it was swollen to three times its size.  (Tr. 257).  On examination, Plaintiff was unchanged.  (Tr. 257).  There was "no tenderness, no swelling or erythema;" very little discomfort with movements of flexion and extension and rotation of the lumbar spine;" straight leg raising was negative, motor was normal in the lower extremities, sensation was essentially normal.  (Tr. 257).  Patella and Achilles reflexes were +2.  (Tr. 257).  No skin changes.  (Tr. 257).  A CAT scan showed "the instrumentation [was] perfectly placed" and there was "no suggestion of any type of nerve impingement."  (Tr. 257).

Plaintiff's next visit with Dr. Gillick was in October 2009.  Dr. Gillick noted that Plaintiff was "still struggling with pain."  (Tr 261).  The "back pain is nothing like it was preoperatively."  (Tr. 261).  Plaintiff has increased pain if he tries to increase his activity.  He still had left leg pain, mostly in the thigh and top of the foot.  (Tr. 261).  On examination, there was "minimal tenderness and minimal pain with flexion and extension movements."  (Tr. 261).  Straight leg raising was negative, motor was normal, there was

hyperesthesia on the top of the left foot, but otherwise normal.  (Tr. 261).  Patella and

Achilles reflexes were +1 and symmetric.  (Tr. 261).  No skin changes.  (Tr. 261).  An X-

ray showed "intact instrumentation, no change in alignment."  (Tr. 261).  A CAT scan

showed that the L5 neural foramen [was] wide open" and that there did "not appear to be

extrinsic compression on the L5 nerve root."  (Tr. 261).

At the next visit in January 2010, Dr. Gillick noted that Plaintiff reported he

"still had some back pain," much better than it was preoperatively but not pain free.  (Tr.

259).  His left leg was still "driv[ing] him crazy with some numbing sensation," worse in

cold weather.  On examination, he had "some discomfort with movements in flexion and

extension and rotation" of his spine.  (Tr. 259).  Straight leg raising was negative and

motor normal.  (Tr. 259).  He had decreased sensation in his left calf and foot, and a

decreased left Achilles reflex, otherwise +1 and symmetric.  (Tr. 259).  No skin changes.

(Tr. 259).  X-rays showed intact instrumentation and good alignment.  (Tr. 259).  Dr.

Gillick said Plaintiff could "continue to maintain a cautious activity level."  (Tr. 259).

III.  *The ALJ's Decision*

In relevant part, the ALJ made the following findings.  First, Plaintiff had "the

following severe impairments: "degenerative disc disease of the lumbar spine and

obesity."  (Tr. 17).  Second, Plaintiff "does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments . . . ."  (Tr. 17).

Third, in relevant part:

-13-

> the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § § 404.1567(b) namely, lifting and carrying 20 pounds occasionally and 10 pounds frequently with a sit/stand option every thirty minutes. He can occasionally do balancing, stooping, kneeling, crouching and crawling. The claimant cannot do pushing and pulling and he cannot operate foot controls with his lower left extremity. The claimant should avoid hazards including moving machinery and heights.

(Tr. 18). Fourth, the claimant is unable to perform any past relevant work. Fifth, at forty-one years old at the time of the alleged onset date of disability, the claimant was defined as a younger individual. Sixth, the claimant has a limited education. Seventh, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (Tr. 22). Plaintiff could be a file clerk, a ticket seller, or cashier. (Tr. 22).

In making these findings, the ALJ did not fully credit Plaintiff's testimony concerning his limitations and his subjective complaints of pain, stating the "medical evidence of record simply does not support the claimant's alleged level of incapacity." (Tr. 19). More specifically, the ALJ first concluded that "the objective evidence fail[ed] to support the severity of [his] symptoms and alleged limitations." (Tr. 19). In support, the ALJ cited three medical tests: first, the September 25, 2007, X-ray, which revealed "advanced disc space narrowing at L5-S1, no fractures, and a small osteophyte at the inferior end-plate of L5 anterior[ly]" (Tr. 19); second, the October 8, 2007, EMG, which "showed only" a left L4-5 radiculopathy (Tr. 19); and third, the October 3, 2007, MRI,

which "revealed only disc degeneration with mild to moderate disc protrusion and marginal osteophytosis impinging upon the dural sac and narrowing both neural foramina, left greater than right, at L5-S1. (Tr. 19).

Next, the ALJ concluded that Plaintiff's testimony regarding his symptoms was not fully credible "because it was overstated, inconsistent with, and not supported by the great weight of the documentary medical evidence." (Tr. 20). As support for this conclusion, the ALJ noted, without elaboration, the epidural injections Plaintiff received from January 2008 through June 2008. She then referred to Dr. Gillick's notes for Plaintiff's first office visit with him, the October 2008 visit when the option of surgery was explored. At that time, Dr. Gillick noted Plaintiff had "tenderness localized to the L5-S1 junction and increased pain with extension."[6] (Tr. 20). The ALJ then continued: "however, his straight leg raising test was negative on the right and caused pain in the back only on the left side. The physical examination further revealed that the claimant's lower extremity motor examination was normal and sensation and reflexes were normal." (Tr. 20).

The ALJ also relied on notes from two other office visits with Dr. Gillick. In August 2009, about seven months after the surgery, Plaintiff reported he had "little to almost no back pain," and that his main complaint was his left leg and big toe. (Tr. 20). In January 2010, examination showed that straight leg raising was negative, and Dr. Gillick wrote Plaintiff could "continue to maintain a cautious activity level." (Tr. 20). Also,

---

[6] Actually, the note reads "a lot of increased pain." (Tr. 226).

Plaintiff reported he "still had some back pain," although it was much better than it was preoperatively.  (Tr. 20).[7]

Further, the ALJ also stated the following in discounting Plaintiff's complaints of pain:

> In this case, the claimant's case in establishing disability is directly dependent on the element of pain which is of an intractable nature.  Pain is subjective and difficult to evaluate, both quantitatively or qualitatively.  Nevertheless, most organic diseases produce manifestations other than pain and it is possible to evaluate the underlying processes and degree of resultant impairment by considering all of the symptoms.  Generally, when an individual has suffered pain over an extended period, there will be observable signs such as a significant loss of weight, an altered gait or limitation of motion, local morbid changes, or poor coloring or station.  In the present case, the claimant has complained of pain over an extended period of time.  None of the above signs of chronic pain are evident.  While not conclusory by itself, this factor contributes to the determination that the claimant is not disabled as a result of pain.

(Tr. 20).

IV.  *Standard of Review*

The Appeals Council's denial of Plaintiff's request for review means the ALJ's decision is the decision of the Commissioner.  *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007).  It is therefore the ALJ's decision we review.  In doing so, we review the ALJ's application of the law de novo, *id., and* we review the ALJ's

---

[7]  Plaintiff also reported at this visit that his left leg was still "driv[ing] him crazy with some numbing sensation," worse in cold weather.  (Tr. 259).

factual findings to see if they are supported by substantial evidence.  *Id.* (citing in part 42

U.S.C. § 405(g)).  Generally, substantial evidence has been defined as "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)(quoted case omitted).  It is

"'more than a mere scintilla but may be somewhat less than a preponderance of the

evidence.'"  *Id.* (quoted case omitted).

We must uphold factual findings supported by substantial evidence.

*Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001).  It follows "that we are not

permitted to weigh the evidence or substitute our own conclusions for that of the fact-

finder."  *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Put another way, we

cannot reverse the Commissioner's decision simply because we might "have decided the

factual inquiry differently."  *Fargnoli, supra,* 247 F.3d at 38.

V.  *Discussion*

    A.  *The ALJ Improperly Relied on Her Own Lay Opinion in*
       *Rejecting Plaintiff's Subjective Complaints of Pain*

"[A]n ALJ may not make speculative conclusions without any supporting

evidence."  *Burnett v. Commissioner*, 220 F.3d 112, 125 (3d Cir. 2000).  "[A]n ALJ may

not make speculative inferences from medical reports," *Plummer v. Apfel*, 186 F.3d 422,

429 (3d Cir. 1999).  An ALJ "may not employ her own expertise against that of a

physician who presents competent medical evidence."  *Id.*  Nor may an ALJ rely on her

own lay analysis of the medical records.  *Cruz v. Colvin*, No. 12-CV-0135, 2013 WL

5299166, at *21 (M.D. Pa. Sept. 17, 2013)(Caldwell, J.)(citing in part *Schmidt v. Sullivan,*

914 F.2d 117, 118 (7th Cir. 1990)).

Plaintiff argues that the ALJ improperly relied on her own lay opinion in

rejecting Plaintiff's subjective complaints of pain.  His objection is based on the following

language from the decision:

> In this case, the claimant's case in establishing disability is directly dependent on the element of pain which is of an intractable nature.  Pain is subjective and difficult to evaluate, both quantitatively or qualitatively.  Nevertheless, most organic diseases produce manifestations other than pain and it is possible to evaluate the underlying processes and degree of resultant impairment by considering all of the symptoms.  Generally, when an individual has suffered pain over an extended period, there will be observable signs such as a significant loss of weight, an altered gait or limitation of motion, local morbid changes, or poor coloring or station.  In the present case, the claimant has complained of pain over an extended period of time.  None of the above signs of chronic pain are evident.  While not conclusory by itself, this factor contributes to the determination that the claimant is not disabled as a result of pain.

(Tr. 20).

This language has appeared from time to time in prior cases.  In some

cases, and apparently in the absence of an objection that it was improper lay opinion, the

court has simply looked to whether the factual assertions about the absence of the

described symptoms are supported by the record.  If there is no support in the record, the

conclusion is rejected as not being supported by substantial evidence.  *See Kostelnick v.*

*Astrue*, No. 12-CV-901, 2013 WL 6448859, at *7 (M.D. Pa. Dec. 9, 2013); *Kinney v.*

*Astrue*, No. 11-CV-1848, 2013 WL 877164, at *2-3 (M.D. Pa. Mar. 8, 2013)("The medical

-18-

records . . . reveal where examining physicians noted an altered gait, local morbid changes (muscle atrophy), loss of weight and limitation of range of motion.  The administrative law judge's finding that the medical records contain no evidence of a significant weight loss, an altered gait, limitation of motion, or local morbid changes is clearly erroneous."); *Ennis v. Astrue*, No. 11-CV-1788, 2013 WL 74375, at *8 (M.D. Pa. Jan. 4, 2013)("Our review of the record reveals that on several occasions Ennis had medical or physical therapy appointments where she exhibited an altered gait and limitation of motion. . . . The record also reveals that Ennis had atrophy of the foot muscles. . . . The administrative law judge's assertion that Ennis did not exhibit an altered gait, limitation of motion or local morbid changes was clearly erroneous."); *Hughes v. Astrue*, No. 10-CV-2574, 2012 WL 833039, at *12-13 (M.D. Pa. Mar. 12, 2012); *Daniels v. Astrue*, No. 08-CV-1676, 2009 WL 1011587, at* 17 (M.D. Pa. April 15, 2009).

On the other hand, other courts have decided that this language is improper lay opinion.  *See Ferari v. Astrue*, No. 07-CV-1287, 2008 WL 2682507, at *7 (M.D. Pa. July 1, 2008)(adopting the report and recommendation of the magistrate judge); *Morseman v. Astrue*, 571 F. Supp. 2d 390, 396-97 (W.D.N.Y. 2008).

We agree with the latter two cases.  As this language reveals, it is based upon the ALJ's own understanding that "most organic diseases" produce symptoms "other than pain" that can be used "to evaluate" Plaintiff's "degree of resultant impairment."  It is also based on the ALJ's understanding that, generally, when an individual has suffered pain over an extended period, there will be observable signs such

as a significant loss of weight, an altered gait or limitation of motion, local morbid changes, or poor coloring or station.  However, this case deals specifically with lower back pain and leg pain arising from degenerative disc disease.  Since the ALJ relied in this case on her general understanding of the symptoms that should appear when a person has complained about longstanding pain, regardless of the illness at issue, she improperly injected her lay opinion into the disability analysis.  She should have instead relied on the medical evidence in the record.

Our conclusion is buttressed by an argument Plaintiff makes on this issue. The ALJ relied in part on the absence of any record that Plaintiff had lost any weight, opining that significant loss of weight is a symptom of longstanding pain.  However, Plaintiff has cited a website that states that weight gain, such as he experienced, is a symptom of chronic pain.  He has also provided evidence that his weight gain is a side effect of gabapentin, one of his medications.[8]

B.  *The ALJ Failed to Explain Why the Medical Evidence She*
    *Cite Supported Her Conclusion about Plaintiff's Complaints of Pain*

Plaintiff argues that the ALJ failed to explain why the medical evidence she cited supported her conclusion about Plaintiff's complaints of pain.  The ALJ must discuss the evidence specifically and indicate the evidence she accepted, the evidence she

---

[8]  If there had been evidence in the record specifically showing why Plaintiff had gained weight, our conclusion on the issue of weight loss or gain might have been different.

rejected and her reasons for doing so.  *See Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981).  Upon review of the ALJ's decision, we agree with Plaintiff.

The ALJ began by citing three medical tests: (1) the September 25, 2007, X-ray, which revealed "advanced disc space narrowing at L5-S1, no fractures, and a small osteophyte at the inferior end-plate of L5 anterior[ly];" (2) the October 8, 2007, EMG, which "showed only" (in the ALJ's phrase) a left L4-5 radiculopathy; and (3) the October 3, 2007, MRI, which "revealed only" (in the ALJ's phrase) "disc degeneration with mild to moderate disc protrusion and marginal osteophytosis impinging upon the dural sac and narrowing both neural foramina, left greater than right, at L5-S1."  (Tr. 19).  As Plaintiff points out, the ALJ does not explain why these tests support her conclusion that Plaintiff had overstated his complaints of pain.

Next, the ALJ concluded that Plaintiff's testimony regarding his symptoms was not fully credible "because it was overstated, inconsistent with, and not supported by the great weight of the documentary medical evidence."  (Tr. 20).  As support for this conclusion, however, the ALJ merely noted, without elaboration, the epidural injections Plaintiff received from January 2008 through June 2008.  As Plaintiff points out, the ALJ ignores that part of the record showing that these injections provided only temporary relief from the pain.

The ALJ then referred to only three of Plaintiff's office visits with Dr. Gillick, the visits in October 2008, August 2009, and January 2010.  The ALJ thought it significant that in the October 2009 visit Dr. Gillick noted that Plaintiff's straight leg raising

test was negative on the right and caused pain in the back only on the left side and that

his physical examination revealed that lower extremity normal motor function and normal

sensation and reflexes.  The ALJ thought it significant that in the August 2009 visit,

Plaintiff reported he had "little to almost no back pain," and that his main complaint was

his left leg and big toe.  Similarly, the ALJ thought it significant that in the January 2010

visit, examination showed that straight leg raising was negative, Dr. Gillick wrote that

Plaintiff could "continue to maintain a cautious activity level," and Plaintiff reported he "still

had some back pain," although it was much better than it was preoperatively.

      It is not apparent from these isolated references why Plaintiff's complaints

of pain and other limitations were inconsistent with the great weight of the documentary

evidence.  The ALJ should have explained why.  We understand that the ALJ need not

refer to every relevant note in the record, but this synopsis was too sparse.  *See Fargnoli*

*v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2000).

      The defendant Commissioner argues that the ALJ's conclusion is supported

by substantial evidence.  Defendant relies on the normal findings in the October 2008

notes and then argues that Dr. Gillick recommended surgery "despite these findings."

Defendant then reviews Plaintiff's visits with Dr. Gillick between October 2008 and

January 2010, noting the normal findings similar to those made in October 2008 and

January 2010.  Defendant maintains that in light of these medical entries, which reveal, in

Defendant's view, "benign physical findings, unremarkable x-rays, and Plaintiff's self-

reports that he was doing well, the ALJ properly determined that Plaintiff's subjective complaints of pain were not fully credible."  (Doc. 15, Opp'n Br. at p. 8).

We reject this argument.  It were not part of the ALJ's reasons for her conclusion, and it is the ALJ's decision we must review, not arguments made in the Commissioner's brief.  *See Fargnoli, supra,* , 247 F.3d at 42 n.6; *Ames v. Astrue*, No.06-CV-2214, 2008 WL 191829, at *4 (M.D. Pa. Jan. 22, 2008)(Caldwell, J.); *Farr v. Colvin*, No. 12-CV-1414, 2014 WL 47379, at *12 n.5 (M.D. Pa. Jan. 6, 2014)("It is the ALJ's responsibility to explicitly provide reasons for his decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.").[9]

Defendant makes other arguments: (1) Plaintiff's self-reported activities contradict his claims of disability; and (2) he continued to drive even though he claimed he had to stop work as a van driver because of his pain.  (Doc. 15, p. 9).  Again, we cannot consider these arguments because it was not part of the ALJ's reasoning.[10]

---

[9]  Defendant also seems to be incorrect in implying the surgery was not necessary.  A utilization review had concluded "that the treatment provided was reasonable and necessary including the surgery."  (Tr. 251).

[10]  Our ruling here also takes care of Plaintiff's argument that the ALJ did not consider all the evidence because she engaged in only a truncated analysis of the medical record.

C.  *Plaintiff's Remaining Claims: the ALJ Failed to Consider
     Plaintiff's Persistent Efforts to Obtain Pain Relief, His Long
     Work History, and the Side Effects of His Pain Medication*

Plaintiff's remaining claims are that the ALJ failed to consider his persistent efforts to obtain pain relief, his long work history, and the side effects of the pain medication he is  taking.  We agree with Plaintiff on all three claims.

On the first of these claims, as Plaintiff notes, Social Security Ruling 96-7p, under "Medical Treatment History, states:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

As Plaintiff points out, his medical history shows that he has consistently attempted to find a treatment for his pain, trying chiropractic, physical therapy, epidural injections, a TENS unit, and finally spinal-fusion surgery.  The ALJ erred in not taking these facts into account in evaluating Plaintiff's complaints of pain.

On the second of these claims, "[w]hen a claimant has worked for a long period of time, his testimony about his work capabilities should be accorded substantial credibility."  *Rieder v. Apfel*, 115 F. Supp. 2d 496, 505 (M.D. Pa. 2000)(citing

-24-

*Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)).  The ALJ erred in not taking

into account Plaintiff's long work history before the accident.  We have considered

Defendant's argument in opposition (Doc. 15, pp. 4-5), and do not accept it.

On the third claim, if an ALJ rejects a claimant's testimony concerning the

side effects of medication, she must explicitly give the reason for doing so.  *Stewart v.*

*Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  Plaintiff's

medications include Gabapentin, Magnacet, Amrix and Amitriptyline, and Plaintiff testified

at the hearing the side effects include loss of focus and problems concentrating.  They

may also include dizziness.  The ALJ did not explicitly deal with the side effects, and

erred in not doing so.

In opposition, Defendant argues that the side effects of any medication

were taken into account by the ALJ's limitation of Plaintiff to jobs that avoid hazards like

moving machinery and heights.  However, as noted above, *Stewart* requires that the ALJ

explicitly address the side effects.  We have considered defendant's other arguments on

this claim and decline to accept them.[11]

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: February 12, 2014

_____

[11]  One of the arguments might have been successful if it had been advanced by the
ALJ, but it was not.  As noted, we review the ALJ's decision, not reasons advanced by the
Commissioner when a clamant seeks judicial review.

-25-